UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KEITH LAMONT FARMER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 3:12-cv-00489 |
| v. ) | Judge Aleta A. Trauger |
| ) | |
| CHRIS PARKER, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Defendant Chris Parker has filed a Second Motion for Summary Judgment (Docket No. 159), to which plaintiff Keith Lamont Farmer filed a Response in opposition (Docket No. 164), and Parker filed a Reply (Docket No. 169). For the reasons stated herein, the motion will be granted in part and denied in part, and Farmer's excessive force claim will proceed to trial on the theory of liability identified herein.

## BACKGROUND

### I. Procedural History

On May 16, 2012, Farmer filed the instant Complaint *pro se*, alleging constitutional tort claims against Parker, the Davidson County Sheriff's Office ("DSCO"), and the Metropolitan Government of Nashville and Davidson County ("Metro Nashville"). On October 4, 2012, the court dismissed all claims against the DCSO and Metro Nashville. (Docket No. 47.) On March 15, 2013, Parker, the lone remaining defendant, filed a Motion for Summary Judgment (Docket No. 108). On April 3, 2013, while that motion was pending, counsel entered appearances on behalf of Farmer. (Docket Nos. 122.) Following a case management conference, the court issued

1

Case 3:12-cv-00489   Document 171   Filed 02/21/14   Page 1 of 19 PageID #: 957

a revised scheduling order that permitted Farmer (now represented by counsel) to conduct discovery before responding to the pending motion. (Docket No. 139 and 143.) On June 6, 2013, Parker withdrew his First Motion for Summary Judgment. (Docket No. 141.)

On December 13, 2013, following the completion of discovery, Parker filed the instant Second Motion for Summary Judgment, in support of which Parker filed a Memorandum of Law (Docket No. 160), a Statement of Material Facts (Docket No. 161), the Second Affidavit of Robert E. Allen Jr. (Docket No. 158), and two deposition transcripts (Docket Nos. 162, Deposition of Jose Hall, and 163, Deposition of Chris Parker). Parker's motion also relied upon evidentiary materials that Parker had previously filed in support of his First Motion for Summary Judgment, including a deposition transcript (Docket No. 113, Deposition of Keith Lamont Farmer) and several affidavits (Docket Nos. 114, Affidavit of Chris Parker, 117, Affidavit of Joseph Friedmann, 118 (Affidavit of Wayne Miller), and 119 (Affidavit of Byron Grizzle)). In support of his Response in opposition to Parker's motion, Farmer filed his own Declaration (Docket No. 167)[1] and a Response to Parker's SUMF and Statement of Additional Undisputed Material Facts ("Farmer's SAMF") (Docket No. 166). In support of his Reply, Parker filed certain evidentiary materials (*see* Docket No. 169, Exs. 1-3) and a Response to Farmer's SAMF (Docket No. 170). Among the materials is video (but not audio) footage from a surveillance camera of the cell block at issue. The video quality is low, it captured only some of the relevant visual information and none of the relevant audio, and is susceptible to multiple interpretations.

---

[1]Farmer's counsel originally filed an un-executed version of the Farmer Affidavit (Docket No. 165), explaining that an "unforeseen relocation" of Farmer within the Tennessee prison system prevented counsel from obtaining a signed version by the response deadline. Six days later, Farmer filed an executed version of the affidavit. (Docket No. 167.) Parker does not object to the court's consideration of the later-filed executed affidavit.

Unless otherwise noted, the court draws the background facts from the parties' respective statements of fact, taking into account the parties' respective objections thereto, and from evidentiary materials in the record. *See* Fed. R. Civ. P. 56(c)(3). The court reasonably construes all facts, including the substance of the video surveillance footage, in the light most favorable to Farmer. In his Reply, Parker objects to the plaintiffs' asserted facts generally, arguing that the court should refuse to consider facts asserted by Farmer for which Farmer did not provide an adequate citation. Although Parker has a point with respect to some of the asserted facts, the court will exercise its discretion under Fed. R. Civ. P. 56 to consider relevant evidence in the record, to the extent it otherwise supports Parker's assertions.

## II.  Facts

The events relevant to this lawsuit took place on January 22, 2012, at the Davidson County Criminal Justice Center ("CJC"). At the time, Farmer was being held at the CJC on criminal charges, and Parker served as a correctional officer with the title of "Corporal".[2]

Unit 5D of the CJC is a "special management" housing unit ("SMU"), which houses inmates who either (a) are being segregated from the general inmate population as punishment for a disciplinary infraction, or (b) otherwise pose a threat to others within the facility. Unit 5D is composed of four "quads." As the result of a December 26, 2011 incident with two CJC officers, Farmer was housed in "Quad 4" of the SMU during the relevant time frame, serving out a 30-day penalty for destruction of property and for refusing a direct order. (*See* Farmer Dep., Ex. 2.)

---

[2]The DSCO terminated Parker effective May 7, 2012. Although it appears that Parker is no longer a DSCO employee, the court will refer to Parker herein as "Corporal Parker."

On January 22, 2012, Corporal Parker escorted Farmer and other inmates from the SMU to the roof of the facility for recreational time. Farmer brought a "big yellow envelope" with him to the roof. The envelope included materials related to a lawsuit that Farmer intended to bring in the near future related to some type of injury to his mouth sustained while eating food at the CJC.[3] Corporal Parker avers that he saw the envelope while on the roof but declined to confront Farmer about it because he (Parker) was "greatly outnumbered" by the inmates on the roof. At the conclusion of the recreational time, Corporal Parker began escorting several inmates, including Farmer, from the recreation area back to their cells in Unit 5D. Initially, all of these inmates were restrained by both leg shackles and handcuffs. After the inmates entered a holding area prior to being released to their cell blocks, Farmer was let out of the holding area first (apparently alone), at which point the holding area door (containing the remaining inmates being escorted) was closed behind him. Corporal Robert Gilmer removed Farmer's leg restraints.[4]

After Farmer's leg shackles were removed, Corporal Parker asked Farmer what was in the yellow envelope. At the time Parker asked this question, Parker's superior officer, Sergeant Farley, was removing handcuffs from an inmate in Quad 1 of Unit 5D, located a short distance away. Farmer told Corporal Parker that the envelope contained legal work. Corporal Parker ordered Farmer to show him the envelope, but Farmer refused the order to let Parker view the

---

[3]Based on Farmer's deposition testimony, it appears that Farmer had not retained an attorney in connection with the putative lawsuit and was preparing to file the action *pro se*. Although not specifically addressed in the record in this case, it appears that Farmer ultimately did file that lawsuit and did so *pro se* (*see Farmer v. Davidson Cnty. Sheriff's Office*, No. 3:12-cv-0434 (M.D. Tenn. filed Apr. 30, 2012)). This court dismissed the action for failure to state a claim.

[4]Parker testified that he asked Corporal Gilmer to release Farmer from the holding area first, so that Parker could retrieve the envelope from Farmer as contraband. (*See* Parker Dep. at 82:23-83:11.)

4

envelope himself; instead, Farmer told Parker that he would permit Parker to view the envelope if Sergeant Farley was present.[5] According to Farmer, Corporal Parker then tried to "snatch" the envelope from him. As Farmer recoiled and said "no," Corporal Parker slammed Farmer into the wall of the cellblock and punched him (Farmer) in the back of the head. Parker then pulled out a can of pepper spray, shook it, counted to three, and sprayed Farmer in the face with pepper spray.[6] According to Farmer, Corporal Parker did not warn Farmer why he was about to use pepper spray or otherwise give Farmer any instructions to avoid being sprayed.[7] Furthermore,

---

[5]*See* Farmer Dep. at 80:3-6 ("I did refuse an order, I told him [']I'll let you see it present with Sergeant Farley,['] which Sergeant Farley – which [sic] was in Quad 1."), 81:12-15 ("I told him, I said no, I said I'll let you go through it with Sergeant Farley, and it's like he wasn't trying to hear it."), and 90:6-10 ("[H]e asked me, let me see the envelope, I told him no, I'll do this with your sergeant and then we can go over this envelope and see what's in this envelope."); Farmer Aff. ¶ 4 ("[I]n fact, [I] told him I would allow a search of the envelope I was holding if Sgt. Farley, another corrections officer in the facility, was also present.").)

[6]Corporal Parker avers that he pushed Farmer against the wall to prevent Farmer from "continuing" to approach Sergeant Farley, who was in a "vulnerable" position relative to Farmer. Corporal Parker's averment depends on a version of the sequence of events that is entirely inconsistent with Farmer's testimony: Farmer contends that he never charged at Parker, that Parker attacked him without provocation, and that he did not turn towards Farley until *after* Parker had punched him, slammed him into the wall, and maced him. Furthermore, the surveillance video reasonably could be construed as corroborating Farmer's account. Under the circumstances, the court does not regard Corporal Parker's self-serving averment as undisputed for purposes of the instant motion. Moreover, "the inquiry in an excessive force case is an objective one: the question of whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Lewis v. City of Irvine*, 899 F.2d 451, 457 (6th Cir. 1990) (quoting *Graham v. Connor*, 490 U.S. at 394 (1989)).

[7]*See* Farmer Dep. at 91:13-92:8 ("Q: [B]efore he sprayed you did he warn you that he was going to spray you? A: No, I don't recall that . . . I didn't hear no give me envelope or I'll spray, I didn't hear none of that. Q: So you didn't hear him say anything like that? A: No, he just shook it . . . and got to spraying. . . . Q: [D]id he ever tell you to stop? A: No, that man didn't give me no warnings, if he had I would have. I don't want to get sprayed with no pepper spray."); *see also* Farmer Dep. at 158:9-11 ("A: He just pulled it out and got to shaking it. Q: But he didn't warn you? A: No warnings.")

5

Farmer avers that, before Corporal Parker attacked him, Farmer did not make any type of threat (physical, verbal, or otherwise) or attempt to run away.[8] For his part, Corporal Parker testified that, once Farmer refused to provide the materials for inspection, he (Parker) believed that Farmer might be concealing a weapon or some other type of harmful contraband.

Immediately following Corporal Parker's assault, Farmer turned towards Sergeant Farley to escape the assault and get help.[9] As video from the incident corroborates, Sergeant Farley approached Farmer and swept his legs, causing Farmer to fall and hit the ground.[10] Corporal Parker then helped Farley to subdue Farmer after he hit the ground. The takedown temporarily rendered Farmer unconscious, although Farmer does recall hearing one of the officers say something to the effect of "get his ass on the ground, get the envelope, get the envelope." (Farmer Dep. at 101:11-13.) Farmer cannot recall how long he blacked out (somewhere between a few seconds and a few minutes), but, when he regained consciousness, he felt an officer's knee on his back and felt a hand (apparently Parker's) searching his buttocks area.

Several other inmates witnessed portions of the incident and generally corroborate certain

---

[8]*See* Farmer Dep. at 87:10-12 ("No, I didn't run away, I basically told him no. He tried to take something from me.")

[9]*See* Farmer Dep. at 91:9-10 ("I know once he sprayed me I tried to run and get help.")

[10]Farmer contends that there is a genuine dispute of material fact as to whether Sergeant Farley alone, as opposed to Farley *and* Corporal Parker, caused Farmer to fall to the ground. In sworn interrogatory responses – served *pro se* – Farmer stated that Sergeant Farley alone swept his legs, causing him to fall to the ground and lose consciousness. At deposition, Farmer initially equivocated as to Corporal Parker's role in the leg sweep but admitted, after persistent questioning, that Farley alone swept his legs. In light of these consistent sworn representations, the court finds that, for purposes of the instant motion, only Sergeant Farley swept Farmer's legs. Be that as it may, testimony from several witnesses, as well as footage from the surveillance video, indicates that Corporal Parker assisted subduing Farmer immediately after Farley swept his legs.

aspects of Farmer's recollection of the incident. Farmer's cellmate, Jose Hall, testified that he saw Corporal Parker attempt to grab Farmer's paperwork, saw Parker grab Farmer, and heard Parker spray Farmer. After the incident, Inmate Hall also saw a "knot" on the back of Farmer's head that, according to Hall, Farmer did not have when they had originally gone up to the recreational area. Inmate Timothy Fields testified that he heard a verbal altercation between Farmer and Corporal Parker, saw Parker ram Farmer's head into the wall, saw Farmer fall to the ground, and saw Sergeant Farley assist in subduing Farmer.[11] Inmate Fields testified that Farmer was restrained and was "not resisting." Inmate Fields also testified that he saw Farmer go "into convulsions" while restrained on the ground. Finally, Inmate Timothy Lillard testified that he saw Corporal Parker ask Farmer for the envelope, heard some type of discussion about Farmer's "legal work," saw Parker spray Farmer with pepper spray, and saw Farmer attempting to "get away from the spray." Inmate Lillard testified that, at some point during the incident, Farmer went into a seizure and began "foaming at the mouth." Inmate Lillard saw Farmer "pass out" before Farmer "came back to his senses."[12]

---

[11]Fields testified to certain facts that are inconsistent with testimony from Farmer and other witnesses. For example, Fields testified that Farmer fell after Parker rammed Farmer's head into the wall twice, and that he did not see Sergeant Farley intervene until after Farmer fell to the ground. Although these inconsistencies will be appropriate subjects for cross-examination to assist the jury in assessing Fields' credibility, they do not, for purposes of the instant motion, preclude consideration of the facts that Fields has corroborated.

[12]Although Corporal Parker concedes that the court need not credit his account of events for purposes of the instant motion, it is worth noting that Corporal Parker's version of the incident is materially inconsistent with Farmer's. Briefly, Corporal Parker contends that, as soon as he asked Farmer for the envelope, Farmer screamed "no" and immediately attempted to "bowl through" Corporal Parker to break away; that is, according to Corporal Parker, Farmer was the first to utilize physical force in the incident. Corporal Parker claims that he pushed Farmer against the wall to restrain him, attempted to "reason" with Farmer, pulled out the can of pepper spray, warned Farmer that, "[i]f you don't stop and comply, I'm going to spray you," and sprayed Farmer for 10 seconds when Farmer refused to comply. Corporal Parker claims that Farmer still

7

Following the incident, Farmer was locked in a restraint chair in a special cell for several hours. While Farmer was restrained, Parker made a special effort to locate Farmer, verbally assaulted him, and threatened to harm Farmer and his family, including Farmer's brother, who was housed in another Unit within the CJC.[13] At deposition, Parker admitted that his comments were "probably not" professional.

Following this incident (hereinafter, the "afternoon incident"), a fellow officer reported Corporal Parker's conduct, after which the CJC Chief of Security met with Parker on February 1, 2012. Parker appeared for a disciplinary hearing on February 6, 2012, after which he was suspended for three days. On or about April 16, 2012, Parker underwent a psychological examination by a forensic psychiatrist to test Parker for post-traumatic stress disorder. Effective May 7, 2012, the DSCO terminated Parker.

Farmer avers that Corporal Parker's action caused him "a great deal of physical and emotional pain," that he suffered a "severe back injury" because of the incident, and that he has

---

refused to let him see the envelope and that Farmer ran towards Sergeant Farley, making Corporal Parker fear for Farley's safety. According to Corporal Parker, Farmer at no point told him that he could search the envelope if another officer (Sergeant Farley) was present. Parker testified that his uses of force were reasonable and necessary under the circumstances. (*See* Parker Dep. at 110:6-19 ("Q: Did you believe you made every effort to avoid this confrontation? A: There was no chance to avoid it. It was what's called 'an immediate use of force.' . . . Q: And your testimony is that there was no alternative but to use force at that time? A: Correct. When he refused an order and assaulted me trying to escape, there's nowhere else to go but a use of – an immediate use of force.") and 112:13-21 ("[H]e is in a calm, natural state, and then escalates immediately in less than a second to refusal of a direct order and physically assaulting me to get past me . . . I couldn't follow the [use of force] ladder. He went straight to assault, noncompliance, and so forth.").)

[13]Another DSCO officer filed an incident report, stating that he heard Corporal Parker tell Farmer, "[D]on't worry about it, everything you didn't get your brother will." (*See* Parker Dep., Ex. 3.) According to Parker, Farmer had threatened Parker's children, to which Parker responded: "How would you like me to do this to your family what you're doing to me, what you're saying to me[?]"

been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), for which he is currently taking medication.[14]

### III. The Motion for Summary Judgment

In his Motion for Summary Judgment, Corporal Parker argues that he is entitled to qualified immunity against all of Parker's claims. In the alternative, Parker argues that there is no genuine issue of material as to the theories of liability advanced in Farmer's Complaint. Specifically, Corporal Parker contends that (1) his alleged verbal threat to harm Farmer's brother did not independently constitute a violation of Farmer's constitutional rights; (2) his alleged "sexual touching" of Farmer did not violate Farmer's constitutional rights; (3) Parker's use of force on Farmer is not actionable because it resulted in *de minimis* injury; and (4) Parker's use of force was reasonable under the applicable constitutional standard.

In response, Farmer argues that (1) the verbal threat is actionable; (2) a use of excessive force is actionable regardless of the severity of the resulting injuries, which Farmer does not concede were *de minimis* in the first place; and (3) there is a genuine dispute of material fact as to whether Corporal Parker acted reasonably. Although Farmer argues that Corporal Parker's touching of Farmer after Farmer was subdued is relevant to his excessive force claim, Farmer appears to concede that the touching was not inherently "sexual." Therefore, Farmer has abandoned that theory of liability, and the court will discuss only the remaining arguments.

## ANALYSIS

---

[14]Corporal Parker contends that Farmer's averment that he was diagnosed with PTSD is inadmissible hearsay. The court finds Corporal Parker's objection to be without merit, because Farmer can testify about the diagnosis and treatment based on personal knowledge. At any rate, the court's findings concerning the instant motion would the same regardless of this particular averment.

9

## I. Qualified Immunity

To establish a claim under § 1983, a plaintiff must show that "a person acting under color of state law deprived [him] of a right secured by the Constitution or law of the United States." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). However, qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shreve v. Franklin Cnty., Ohio*, – F.3d – , 2014 WL 463477, at *7 (6th Cir. Feb. 6, 2014); *Burgess v. Fletcher*, 735 F.3d 463, 472 (6th Cir. 2013); *Brown v. Weber*, – F. App'x – , 2014 WL 552998, at *3 (6th Cir. Feb. 13, 2014). Once raised, it is the plaintiff's burden to show that a defendant is not entitled to qualified immunity. *Shreve*, 2014 WL 463477, at *7. The Sixth Circuit has generally used a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident." *Id.* A court may consider these steps in either order. *Id.*

## II. Substantive Basis for Farmer's Claims

It is well-established that, under the Fourteenth Amendment's Due Process Clause, pre-trial detainees receive at least as much constitutional protection against excessive force as a convicted inmate has under the Eighth Amendment, which prohibits the imposition of cruel and unusual punishment. *Shreve*, 2014 WL 463477, at *6. Nevertheless, there has been some uncertainty as to whether, and under what circumstances, pre-trial detainees should receive *more* protection than convicted prisoners. The Sixth Circuit's recently published decision in *Shreve v. Franklin County* has clarified the applicable standards with respect to excessive force claims by

10

pre-trial detainees, who are protected by the Fourteenth Amendment's Due Process Clause against actions that "shock the conscience." *Id.* In *Shreve*, the Sixth Circuit found that an excessive force claim under the Fourteenth Amendment "operates on a sliding scale," depending on whether the circumstances involve a "rapidly evolving, fluid, and dangerous predicament," as opposed to a situation in which the defendants are afforded a "reasonable opportunity to deliberate." *Id*.

Where, as here, officials respond to "a rapidly evolving, fluid, and dangerous predicament, the Fourteenth Amendment's excessive-force standard *is the same as the Eighth Amendment's*." (*Id.*) (emphasis added). Thus, to prove an excessive force claim relating to the plaintiff's status as a pre-trial detainee, a plaintiff "must show that the defendant acted maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline." *Id.* (quoting *Burgess*, *v. Fischer*, 735 F.3d 462, 473 (6th Cir. 2013)). Here, Corporal Parker concedes that Farmer had a "clearly established" constitutional right to be free from excessive force meeting this standard; however, Corporal Parker contends that the facts, even when construed in the light most favorable to Farmer, do not meet the legal standard for excessive force – *i.e.*, that Farmer has not shown a constitutional violation.

Construing the facts in the light most favorable to Farmer, Corporal Parker used excessive force on Farmer in the initial incident. Corporal Parker argues, without citing to any particular written policy, that Farmer was not permitted to carry the envelope to or from the recreational area and that, as a consequence, Corporal Parker was justified in attempting to search and/or confiscate it. Even taking that to be true, it did not justify the nature and amount

11

of force that Corporal Parker used. When asked to furnish the envelope for a search, Farmer told Corporal Parker that the envelope contained "legal" documents and asked that Corporal Parker call over a nearby superior officer, Sergeant Farley, to be present for the search. Farmer did not threaten Corporal Parker, brandish the envelope in a threatening or furtive manner, attempt to flee, or otherwise provoke Corporal Parker. Instead of calling over Sergeant Farley or otherwise attempting to reason with Farmer, Corporal Parker punched Farmer – who was still handcuffed – and slammed him into a wall. Corporal Parker then pulled out a can of pepper spray and, without making any specific demand for compliance, sprayed Farmer with pepper spray. In an attempt to escape Corporal Parker's abuse, Farmer turned toward Sergeant Farley to ask for help.

Whether or not Farmer was actually correct about whether a superior officer needed to be present before his "legal mail" could be opened, the facts show that Corporal Parker exceeded the amount of force that was reasonably necessary to address the situation and gain Farmer's compliance. Essentially, Corporal Parker physically assaulted and maced a restrained inmate who had not engaged in any threatening behavior. Corporal Parker, not Farmer, escalated the incident into a violent physical altercation. Furthermore, given that Corporal Parker was aware that Farmer had the envelope while Farmer was still in leg restraints (in addition to handcuffs), it is unclear why Corporal Parker did not search Farmer after he had been released from the holding area but before Corporal Gilmer removed Farmer's leg restraints, which gave Farmer more freedom of motion. These facts, if true, permit a finding that the use and/or amount of force by Parker was unnecessary, suggesting that Corporal Parker's actions were "not taken in good faith and were perhaps motivated by the malicious purpose of causing harm." *Williams v. Curtin*, 631 F.3d 380, 384 (6th Cir. 2011); *see also Bennett v. Krakowski*, 671 F.3d 553, 562–63

(6th Cir. 2011) (where plaintiff laid on ground to submit to arrest after initially fleeing, no force was required to restrain him, and plaintiff did not assault or otherwise take "aggressive action" against defendants, defendants engaged in excessive force by punching him, kneeing him in the back, and tasering him); *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (where plaintiff was handcuffed and compliant with officers' demands, officers used excessive force by knocking plaintiff's legs out from under him and throwing him to the pavement when plaintiff reacted to witnessing his dog get shot); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (beating incapacitated subject was excessive)*; Adams*, 31 F.3d at 385 ("[I]f no assault occurred and plaintiff was not acting in a threatening or violent manner as plaintiff and two witnesses allege, plaintiff did not pose an immediate threat to the police officers".)*; Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009) (where officer initiated physical confrontation by pushing plaintiff, plaintiff gave a "*de minimis*" push back, and officer proceeded to beat plaintiff, officer's use of force was "excessive").   Because a jury could conclude that a reasonable officer would have known that his handling of the situation violated Farmer's clearly established constitutional rights as a pre-trial detainee, these facts alone justify a denial of qualified immunity.

Furthermore, in the afternoon incident, Corporal Parker taunted Farmer and threatened Farmer's brother while Farmer was restrained, indicative of continuing personal animus towards Farmer and a lack of good faith justification for Corporal Parker's actions earlier that day. Corporal Parker's actions in the afternoon incident could support a finding that, earlier that day in the altercation with Farmer, Corporal Parker had acted maliciously and sadistically for the purpose of causing harm, rather than in a good faith effort to maintain discipline.

13

Finally, Corporal Parker contends that, under the DSCO Use of Force Policy in effect at the time, he utilized the appropriate amount of force. But even the DSCO Use of Force Policy states that the level of force used against in inmate must be "justifiable" and used "only when there is no other option," consistent with applicable constitutional standards. Here, Corporal Parker's references to the Use of Force Policy merely beg the question: did Corporal Parker use excessive force? Construing the facts in the light most favorable to Farmer, a reasonable factfinder could conclude that he did.

Where, as here, "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury, the jury becomes the final arbiter of a claim of immunity." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (finding that, where "the reasonableness of the use of force is the linchpin of the case," summary judgment was not warranted).

### III. *De Minimis* **Force Compared to** *De Minimis* **Injury**

Corporal Parker argues that he did not cause Farmer to suffer more than *de minimis* injury and that, as a consequence, he cannot be held liable for an excessive force violation. Corporal Parker misconstrues the law.

> [W]hile an excessive force claim may be established through evidence of severe injury or physical contact, this Circuit has not required that this must be the case. Rather, we have held that a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage.

*Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009); *see also Wilkins v. Gaddy*, 130 S. Ct. 1175, 1179-90 (2010). Thus, "[t]he seriousness of the injuries are not dispositive; as the Supreme Court has held, 'when prison officials maliciously and sadistically

14

use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident.'" *Williams*, 631 F.3d at 383 (internal brackets omitted, ellipsis in original) (quoting *Hudson v. McMillian*, 501 U.S. 1, 6 (1992)). Therefore, the relevant question is whether the *force* was more than *de minimis*, not whether Farmer suffered more than *de minimis injuries* from that force. Here, construing the facts in the light most favorable to Farmer, Corporal Parker's uses of force, which at least included slamming Farmer's head into the wall and spraying him with pepper spray, were excessive. Because Parker used excessive force, Farmer's excessive force claim may proceed, regardless of whether the resulting injuries were more than *de minimis*.

At any rate, the court disagrees with the premise of Corporal Parker's argument, because a reasonable factfinder could conclude that Corporal Parker proximately caused Farmer to suffer more than *de minimis* injury. Corporal Parker argues that he cannot be held liable for any injuries to Farmer's back, because those injuries occurred as a result of Sergeant Farley's leg sweep. Even assuming that Farley's leg sweep caused Farmer's injuries, there is a genuine dispute of fact as to whether that injury occurred as a proximate consequence of Corporal Parker's uses of excessive force on Farmer, which caused Farmer to turn towards Sergeant Farley for help in the first place, precipitating Sergeant Farley's takedown. Section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Powers v. Hamilton Cnty. Public Defender Com'n*, 501 F.3d 592, 609 (6th Cir. 2007). "[T]he § 1983 proximate-cause question [i]s a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct." *Id.* Thus, "even if an

15

intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Id.*; *see also Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) ("The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.") Here, after Farmer had asked Corporal Parker to call Sergeant Farley over to assist in searching Farmer's envelope, Corporal Parker beat and maced Farmer, in response to which Farmer reasonably attempted to evade the assault and seek help from Farley (which Farmer had been asking for in the first place). A reasonable factfinder could conclude that it was reasonably foreseeable that, once Parker unnecessarily provoked a physical confrontation and Farmer reasonably turned to evade the assault, another correctional officer would attempt to assist Parker by conducting a physical takedown of Farmer. Therefore, the court finds that there is a material issue of disputed fact as to whether Parker's use of excessive force proximately caused any injuries that Farmer sustained from Sergeant Farley's leg sweep.

## IV. The Afternoon Incident

As discussed herein, Corporal Parker's statements during the afternoon incident are relevant to whether Corporal Parker had acted in good faith earlier that day. Farmer argues that Parker's statements to Farmer during the afternoon incident are also actionable as an independent constitutional violation.

Farmer has cited three cases in support his contention that the verbal threats are actionable, although none of the cases involved only verbal threats and/or are otherwise

16

distinguishable. In *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995), while an inmate was checking his mail, an officer approached the inmate from behind with a knife and proceeded to cut off "a great portion" of the inmate's hair (without a request from the inmate), while another officer "stood there grinning and smiling, while [the first officer] was laughing and dropping [the inmate's hair] on the floor." *Id.* at 1035. The Sixth Circuit found that the incident could support an Eighth Amendment excessive force claim against the officers, because it reflected the type of "unnecessary and wanton infliction of pain" that the Eighth Amendment forbids. *Id.* As the Sixth Circuit viewed the facts, "the defendants' actions were designed to frighten and degrade [the inmate] by reinforcing the fact this his continued well-being was entirely dependent on the good humor of his armed guards. To us, given the closed nature of the prison environment, this constitutes a totally unwarranted, malicious and sadistic use of force to cause harm." *Id.* In *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999), the Sixth Circuit recognized that prisoners could assert a First Amendment retaliation claim, where prison officials retaliated against the plaintiffs for filing lawsuits and grievances by bringing them cold food, withholding pens, moving them to undesirable segregation units, and placing them with undesirable cellmates. Finally, in *Hudson v. McMillian*, Justice Blackmun, in an opinion concurring in the judgment, speculated that "[i]t is not hard to imagine inflictions of psychological harm – without corresponding physical harm – that might prove to be cruel and unusual punishment," although Justice Blackmun conceded that the issue was not presented in *Hudson* in the first place. 501 U.S. at 16 (Blackmun, J., concurring in the judgment).

Having conducted its own research, the weight of authority is that verbal threats alone are not typically actionable as "excessive force." *See Williams v. Sandel*, 433 F. App'x 353, 362-

17

363 (6th Cir. 2011) (citing various supporting cases); *see also Settles v. McKinney*, 2013 WL 2151560, at *5 (W.D. Ky. May 16, 2013) (dismissing plaintiff inmate's excessive force claim for "verbal abuse," where plaintiff contended that defendants "cursed at, threatened, and placed him in fear of physical harm or death"); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 599 (6th Cir. 2012) (verbal threat did not constitute excessive force). Although Justice Blackmun's non-binding concurring opinion in *Hudson* suggests that the Eighth Amendment might contemplate actionable psychological harm, the court finds that this case does not present circumstances that might otherwise warrant pressing the borders of Eighth Amendment doctrine, particularly in the absence of any persuasive caselaw cited by the plaintiff here. Therefore, the court finds that the afternoon incident is not independently actionable, and Corporal Parker is entitled to qualified immunity on that ground alone.

Moreover, even if there were a plausible case that Corporal Parker's verbal comments to Farmer while he was restrained constituted actionable "psychological harm" for Eighth Amendment purposes – an issue left unresolved in *Hudson* – Farmer has not shown that his right to be free from such harm was a "clearly established" constitutional right when the incident occurred. Therefore, even if the court were to assume that the afternoon incident was otherwise independently actionable, Corporal Parker would be entitled to qualified immunity with respect to that particular incident for that additional reason.

## V. <u>Summary</u>

In sum, the court finds that Corporal Parker is not entitled to qualified immunity with respect to Farmer's otherwise actionable excessive force claim related to the earlier of the two incidents at issue. However, the court finds that, although the afternoon incident is relevant to

18

Farmer's excessive force claim concerning the morning incident, the afternoon incident is not independently actionable as an excessive force claim. Finally, the court finds that there is a genuine dispute of material fact as to whether Corporal Parker proximately caused all of the injuries that Farmer claims to have suffered as a result of the incident.

## CONCLUSION

Corporal Parker's Second Motion for Summary Judgment will be granted in part and denied in part. Farmer's excessive force claim with respect to the morning incident will proceed to trial, subject to the clarifications set forth herein. Farmer's independent excessive force claim relative to the afternoon incident will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge